IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CRISTIAN LEONARDO PINEDA-BERRIOS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | 1:25-cv-2332 (LMB/LRV) |
| ) | |
| TODD M. LYONS, et al., ) | |
| ) | |
| Respondents. ) | |

MEMORANDUM OPINION

Petitioner Cristian Leonardo Pineda-Berrios ("Pineda-Berrios" or "petitioner"), a native and citizen of El Salvador, has filed a three-count Petition for Writ of Habeas Corpus ("Petition") under 28 U.S.C. § 2241, in which he asserts that he has been illegally detained by the U.S. Department of Homeland Security's ("DHS") Immigration and Customs Enforcement ("ICE") agency since November 13, 2025. Specifically, he alleges that his continued detention violates the Immigration and Nationality Act ("INA") (Count I), the bond regulations (Count II), and his Fifth Amendment due process rights (Count III).

Pineda-Berrios is currently detained at the Farmville Detention Center, which is within the Court's jurisdiction and the basis upon which he is suing Jeffrey Crawford, the warden of the Farmville Detention Center. Pineda-Berrios has also sued Todd M. Lyons, the Acting Director of ICE; Joseph Simon, the Director of the Washington Field Office of ICE's Enforcement and Removal Operations Division; Kristi Noem, the DHS Secretary; Pamela Bondi, the Attorney General; and the Department of Homeland Security (collectively, "the federal respondents"). For the reasons discussed in this Memorandum Opinion, the Court finds that the process the federal respondents used to revoke Pineda-Berrios's parole violated the Fifth Amendment.

Accordingly, Pineda-Berrios's Petition will be granted as to Count III, and the federal respondents will be ordered to release him from custody immediately.

I.

"Every year, hundreds of thousands of aliens are apprehended at or near the border attempting to enter this country illegally." Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 106 (2020). Individuals detained upon arrival into the United States are grouped into two categories: those covered by 8 U.S.C. § 1225(b)(1) and those covered by 8 U.S.C. § 1225(b)(2). Jennings v. Rodriguez, 583 U.S. 281, 287 (2018). Relevant here, § 1225(b)(1) governs noncitizens "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation," id. (citing 8 U.S.C. § 1225(b)(1)(A)(i)), as well as to other noncitizens who receive special designation by the Attorney General, 8 U.S.C. § 1225(b)(1)(A)(iii).

Noncitizens subject to § 1225(b)(1) are generally removed "without further hearing or review" pursuant to an expedited process. Id. § 1225(b)(1)(A)(i). The only way for a noncitizen subject to § 1225(b)(1) to avoid the expedited removal process is by indicating "either an intention to apply for asylum . . . or a fear of persecution." Id. Such indication results in the noncitizen being referred "for an interview by an asylum officer." Id. § 1225(b)(1)(A)(ii). During that interview—which is known as a credible fear interview—the "applicant need not show that he . . . is in fact eligible for asylum." Thuraissigiam, 591 U.S. at 109 (emphasis in original). Rather, all that he "must show to avoid expedited removal is a 'credible fear,'" which "equates to only a 'significant possibility' that the alien would be eligible" for asylum. Id. at 109–10 (quoting 8 U.S.C. § 1225(b)(1)(B)(v)).

If the applicant is found not to have such a fear, the asylum officer "shall order the alien removed from the United States without further hearing or review," and the applicant "shall be detained . . . until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). If the asylum officer finds an

applicant's asserted fear to be credible, the noncitizen will be processed through regular—rather than expedited—removal proceedings pursuant to 8 U.S.C. § 1229a. Thuraissigiam, 591 U.S. at 110 (citing 8 C.F.R. § 208.30(f)). This regular removal process involves an evidentiary hearing before an Immigration Judge and affords the noncitizen the opportunity to raise an asylum claim as a defense to removal. Id. at 108; see 8 U.S.C. § 1229a(b)(4). Pending "further consideration of the application for asylum," the noncitizen "shall be detained." 8 U.S.C. § 1225(b)(1)(B)(ii); see Jennings, 583 U.S. at 299.

Despite § 1225(b)(1)'s mandatory detention provisions, a noncitizen subject to § 1225(b)(1) "may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.'" Jennings, 583 U.S. at 288 (quoting 8 U.S.C. § 1182(d)(5)(A)). Whether to grant parole requires a "case-by-case" determination, 8 U.S.C. § 1182(d)(5)(A), and DHS "may require reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so," 8 C.F.R. § 212.5(d). Specifically, the regulations require that, in determining whether parole is appropriate, DHS "should apply reasonable discretion" and may consider "all relevant factors," including "[t]he giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure"; "[c]ommunity ties such as close relatives with known addresses"; and "[a]greement to reasonable conditions (such as periodic reporting of whereabouts)." Id. Importantly, humanitarian parole "shall not be regarded as an admission of the alien," and if parole is revoked, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Put differently, "parole under § 1182(d)(5)(A) employs a legal fiction whereby non-citizens are physically permitted to enter the country but are nonetheless treated,

for legal purposes, as if stopped at the border." Chanaguano Caiza v. Scott, 2025 WL 3013081, at *5 (D. Me. Oct. 28, 2025) (cleaned up).

In determining whether to revoke parole, DHS must determine whether the purposes of parole "have been served." 8 U.S.C. § 1182(d)(5)(A). The regulations provide further guidance on when, and how, DHS may terminate parole:

> (1) Automatic. Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed, at the expiration of the time for which parole was authorized, and in the latter case the alien shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required.
>
> (2)(i) On notice. In cases not covered by paragraph (e)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of [a DHS official], neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified. Any further inspection or hearing shall be conducted under section 235 or 240 of the Act and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless in the opinion of the official listed in paragraph (a) of this section the public interest requires that the alien be continued in custody.

8 C.F.R. § 212.5(e).

II.

The following facts are undisputed. On May 6, 2024, Customs and Border Protection agents encountered Pineda-Berrios, a 25-year-old native and citizen of El Salvador, in or around Del Rio, Texas and determined that he had unlawfully entered the United States without being admitted or paroled by an immigration officer. [Dkt. No. 4-1] ("Mullan Decl.") at ¶¶ 5–6. Pineda-Berrios was processed for expedited removal pursuant to § 1225(b)(1); however, on May 7, 2024, he expressed a fear of returning to El Salvador and was scheduled for a credible fear

4

interview. Id. ¶¶ 7–8. An asylum officer found that Pineda-Berrios did not have a credible fear of persecution if returned to El Salvador, but that finding was vacated by an Immigration Judge. Id. ¶¶ 9–10. Accordingly, on June 6, 2024, Pineda-Berrios was placed into standard removal proceedings pursuant to § 1229a and issued a Notice to Appear that charged him with being inadmissible to the United States. Id. ¶ 11.

Pineda-Berrios remained detained until June 11, 2024, when he was paroled into the United States pursuant to § 1182(d)(5)(A). [Dkt. No. 9-1]. At that time, DHS issued to Pineda-Berrios—and Pineda-Berrios signed—an Interim Notice Authorizing Parole ("Interim Notice").[1] Id. That document states:

> This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided to parole you from its custody pursuant to its authority under section 212(d)(5)(A) of the Immigration and Nationality Act. This notice is being issued to you in lieu of Form I094, *Arrival-Departure Record, see* 8 C.F.R. § 235.1(h)(2), and you should maintain a copy of this letter in your possession at all times.
>
> Your parole authorization is valid for one year beginning from the date on this notice and will automatically terminate upon your departure or removal from the United States or at the end of the one-year period unless ICE provides you with an extension at its discretion. ICE may also terminate parole on notice prior to the automatic termination date. Parole is entirely within the discretion of ICE and can be terminated at any time and for any reason. Your parole is not valid for work authorization and is not an admission in lawful status.
>
> Parole is conditioned on you complying with the terms and conditions of your release. You must notice ICE and the immigration judge of any address correction or address change. You must report for every scheduled hearing before the immigration court and every appointment as directed by ICE (including for removal from the United States should you become subject to a final removal order). You must not violate any local, State, or Federal laws or ordinances. You must comply with any other specified conditions if identified separately.

---

[1] During the February 6, 2026 hearing, counsel for the federal respondents indicated that only an English version of the Interim Notice was available in petitioner's file. Counsel for petitioner represented that petitioner does not speak English.

Id.² Under the Interim Notice, Pineda-Berrios's parole purportedly terminated on June 11, 2025; however, there is nothing in the record before the Court indicating that DHS contacted Pineda-Berrios at the end of the one-year period, and Pineda-Berrios appears to have remained on parole without incident until he was arrested by ICE on November 13, 2025.

On August 18, 2025, Pineda-Berrios appeared virtually before the Hyattsville Immigration Court for a standard removal hearing under § 1229a. Mullan Decl. ¶ 13. The Immigration Judge sustained the charge of removability, denied Pineda-Berrios's applications for relief, and ordered that Pineda-Berrios be removed to El Salvador. Id. On September 10, 2025, Pineda-Berrios appealed that decision to the Board of Immigration Appeals. Id. ¶ 14. That appeal is currently pending. Id. On November 13, 2025, ICE agents encountered Pineda-Berrios near Washington, D.C. and took him into custody. Id. ¶ 15.

Pineda-Berrios filed his Petition for Writ of Habeas Corpus on December 12, 2025. [Dkt. No. 1]. The Court subsequently entered an Order requiring that he not "be removed or transferred from this district for any reason without this Court's permission" and directing the federal respondents to file a responsive pleading. [Dkt. No. 2]. In response, the federal respondents filed an opposition, arguing that Pineda-Berrios is lawfully detained under § 1225(b)(1). On February 2, 2026, the Court entered an Order informing the parties of its concern that the federal respondents may have revoked petitioner's parole in violation of 8 C.F.R. § 212.5(e). [Dkt. No. 8]. The Court heard oral argument on February 6, 2026.

III.

The central question posed in this Petition is whether Pineda-Berrios's continued detention violates the Fifth Amendment. For the reasons discussed below, the Court finds that

---

² Section 212(d)(5)(A) of the INA is codified at 8 U.S.C. § 1182(d)(5)(A).

6

the federal respondents' summary revocation of Pineda-Berrios's humanitarian parole without consideration of his individualized circumstances violates fundamental due process principles.

A.

The Court begins, as it must, with considering whether it has jurisdiction to review the federal respondents' revocation of Pineda-Berrios's parole. The federal respondents contend that the "discretionary nature of parole means that judicial review is circumscribed by 8 U.S.C. § 1252(a)(2)(B)(ii)." [Dkt. No. 9] at 2 n.2. In relevant part § 1252(a)(2)(B)(ii) strips federal courts of jurisdiction to review any "decision or action" of the "Secretary of Homeland Security the authority for which is specified under this subchapter to be in [her] discretion."

In deciding whether § 1252(a)(2)(B)(ii) bars judicial review, the Court will employ the "familiar principle of statutory construction" that there is a "the presumption favoring judicial review of administrative action." Kucana v. Holder, 558 U.S. 233, 251 (2010). The presumption of reviewability has been "consistently applied" to "legislation regarding immigration," id., and can be overcome only by "clear and convincing evidence of congressional intent to preclude judicial review," Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (cleaned up).

Against this backdrop, § 1252(a)(2)(B)(ii) does not strip the Court of jurisdiction to consider the federal respondents' revocation of Pineda-Berrios's parole because DHS's authority to revoke parole is not purely discretionary. Section 1252(a)(2)(B)(ii) precludes judicial review only where DHS's authority is committed to the agency's discretion by statute. Kucana, 558 U.S. at 247. This provision does not bar review of all discretionary decisions; rather, it "applies only to acts over which a statute gives [DHS] pure discretion unguided by legal standards or statutory guidelines." Medina-Morales v. Ashcroft, 371 F.3d 520, 528 (9th Cir. 2004); see United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266–67 (1954) (defining "discretion" as the power of an officer to act "according to his own understanding and

7

conscience"). DHS certainly has some discretion to revoke parole, but that discretion is limited by § 1182(d)(5)(A) and its implementing regulations, which require DHS to consider on a case-by-case basis whether the purposes of parole have been accomplished and whether "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." 8 C.F.R. § 212.5(e); L.M. v. Noem, 2026 WL 103231, at *8–9 (D. Nev. Jan. 14, 2026). Simply put, DHS must comply with these statutory and regulatory requirements, and it "is not within the discretion granted by [§ 1182(d)(5)(A)]" for DHS to refuse to comply. Y-Z-L-H v. Bostock, 792 F. Supp. 3d 1123, 1138 (D. Or. 2025). Accordingly, § 1252(a)(2)(B)(ii) does not act as a jurisdictional bar.

Even if DHS's authority to revoke humanitarian parole were purely discretionary, § 1252(a)(2)(B)(ii) only strips courts of jurisdiction to review the agency's substantive decisions. Mantena v. Johnson, 809 F.3d 721, 728 (2d Cir. 2015). Courts still have jurisdiction to evaluate whether DHS complied with its own procedures and regulations. Id.; see Islam v. Dir. of USCIS, 2025 WL 1554777, at *3 n.2 (4th Cir. June 2, 2025). And § 1252(a)(2)(B)(ii) does prohibit courts from considering whether DHS acted in a manner consistent with the Constitution. Agidi v. Garland, 2021 WL 5003416, at *1 (4th Cir. Oct. 28, 2021). Because Pineda-Berrios contends that he has been detained in violation of his due process rights, § 1252(a)(2)(B)(ii) does not preclude judicial review. Accord Orellana v. Francis, 2025 WL 2402780, at *4 (E.D.N.Y. Aug. 19, 2025).

## B.

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law. U.S. CONST. amend V. Although noncitizens "on the threshold of initial entry" are entitled only to the procedures authorized by Congress, any person who has "passed through our gates" is entitled to "proceedings conforming to traditional standards of fairness

encompassed in due process of law." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953). Put differently, the Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001). Pineda-Berrios has been present in the United States for over 19 months. It is irrelevant that he was detained "on the threshold of initial entry" because he has since "passed through our gates." Mezei, 345 U.S. at 212; accord Perez v. LaRose, 2025 WL 3171742, at *4 (S.D. Cal. Nov. 13, 2025). Accordingly, Pineda-Berrios is entitled to all the process the Constitution affords.

C.

To determine which procedures are constitutionally sufficient to satisfy the Due Process Clause, the Court applies the familiar three-part test established in Mathews v. Eldridge, 424 U.S. 319 (1976). Under that test, the Court must consider: (1) "the private interest that will be affected by the official action"; (2) the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335. Agreeing with the recent decisions of several other jurists,[3] the Court finds that all three Mathews factors point in the same direction: The unilateral revocation of Pineda-Berrios's parole without providing him with individualized consideration and an opportunity to be heard deprived him of his due process rights.

---

[3] Perez, 2025 WL 3171742, at *4–5; L.M., 2026 WL 103231, at *12–14; J-C-R-M v. Wamsley, 2025 WL 3527108, at *9 (D. Or. Dec. 9, 2025); Martinez-Gutierrez v. Noem, 2026 WL 279890, at *2–4 (E.D. Cal. Feb. 3, 2026); M.B. v. Noem, 2026 WL 74155, at *2–4 (E.D. Cal. Jan. 9, 2025); Salazar v. Casey, 2025 WL 3063629, at *3–5 (S.D. Cal. Nov. 3, 2025); Munoz Materano v. Arteta, 804 F. Supp. 3d 395, 416–20 (S.D.N.Y. Sept. 12, 2025).

First, Pineda-Berrios has a significant liberty interest in remaining out of custody. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690. In the parole context, "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." Morrissey v. Brewer, 408 U.S. 471, 482 (1972). Subject to the conditions of parole, a parolee "is free to be with family and friends and to form the other enduring attachments of normal life." Id. And noncitizens paroled into the United States under § 1182(d)(5)(A) may be eligible for certain federal public benefits, 8 U.S.C. §§ 1611(a), 1641(b)(4); can apply for adjustment of status under 8 U.S.C. § 1255(a); and can seek employment authorization, 8 C.F.R. § 274a.12(c)(11).

Pineda-Berrios's liberty interest does not vanish simply because DHS's authority to revoke parole is partially discretionary. See Ortega v. Bonnar, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("[T]he fact that a decision-making process involves discretion does not prevent an individual from having a protectable liberty interest."); M.B. v. Noem, 2026 WL 74155, at *3 (E.D. Cal. Jan. 9, 2025) ("[O]nce the government exercises its discretion in ways that create constitutional rights, the fact that the government retains statutory discretion does nothing to supplant those previously created rights."). Rather, "even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody [he] has a protected liberty interest in remaining out of custody." Pinchi v. Noem, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025).

Nor does the Interim Notice's one-year limitation "somehow obviate the need for the government to provide an individualized hearing prior to detaining the parolee." L.M., 2026 WL 103231, at *13; accord Martinez-Gutierrez v. Noem, 2026 WL 279890, at *3 (E.D. Cal. Feb. 3,

10

2026) (holding that the Interim Notice's expiration date "does not mean Petitioner lacks a protected liberty interest"). As an initial matter, although the Interim Notice suggests a contrary position, 8 C.F.R. § 212.5(e) requires DHS to engage in a "case-by-case determination before parole can lawfully be revoked." Orellana, 2025 WL 2402780, at *5. DHS cannot simply tack on a one-year limitation to the grant of parole without considering Pineda-Berrios's individualized circumstances and whether the purposes of parole would be accomplished within one year. Moreover, Pineda-Berrios continued to "establish[] a life for himself" in the United States after the one-year period lapsed "based on the implied promise that he would remain released in spite of the dated expiration."[4] Martinez-Gutierrez, 2026 WL 279890, at *3. For these reasons, Pineda-Berrios's "liberty interest did not expire along with his parole." Omer G.G. v. Kaiser, 2025 WL 3254999, at *5 (E.D. Cal. Nov. 22, 2025).

Second, the procedures used to revoke Pineda-Berrios's parole significantly risked erroneously depriving him of his liberty interest in remaining out of custody. At the outset, it is unclear which procedures the federal respondents claim to have used in revoking Pineda-Berrios's parole. When Pineda-Berrios was paroled on June 11, 2024, he was issued an Interim Notice stating that his "parole authorization [was] valid for one year" and would "automatically terminate . . . at the end of the one-year period."[5] [Dkt. No. 9-1]. On June 11, 2025, nothing happened, which is unsurprising given that the Interim Notice did not specify what would happen at the end of the one-year period. About two months later, Pineda-Berrios appeared for

---

[4] The Interim Notice stated that parole expired on June 11, 2025, [Dkt. No. 9-1]; however, Pineda-Berrios was not detained by ICE until November 13, 2025, Mullan Decl. ¶ 15.

[5] The Court notes that information contained in the Interim Notice is incorrect. In particular, the Interim Notice states that "[p]arole is entirely within the discretion of ICE and can be terminated at any time and for any reason." [Dkt. No. 9-1]. This statement directly contradicts 8 C.F.R. § 212.5(e), which provides that DHS may revoke only under certain circumstances.

11

his removal hearing before an Immigration Judge, who presumably had access to Pineda-Berrios's file but, on this record, did not inform Pineda-Berrios that his parole had terminated. Another three months passed before Pineda-Berrios was arrested by ICE agents who, according to the federal respondents' counsel, may or may not have known that Pineda-Berrios had been paroled into the United States.

To the extent the federal respondents claim that the Interim Notice's one-year limitation revoked Pineda-Berrios's parole, it strains credulity to contend that the Interim Notice adequately protected his liberty interest in remaining out of custody. Pineda-Berrios's parole into the United States on June 11, 2024 was premised on the determination that he did not pose a safety risk or a flight risk. See Saravia v. Sessions, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017). There is absolutely no evidence in this record that any DHS officer "based the one-year parole period on any determination that the risk-reward calculus would change after one year." Qasemi v. Francis, 2025 WL 3654098, at *13 (S.D.N.Y. Dec. 17, 2025); see Rodriguez-Acurio v. Almodovar, 2025 WL 3314420, at *2 (E.D.N.Y. Nov. 28, 2025). Nor has any immigration officer "articulated that the humanitarian reasons and public benefit that supported [Pineda-Berrios's] release no longer exist." Qasemi, 2025 WL 3654098, at *13; accord Pinchi, 792 F. Supp. 3d at 1035 (finding a due process violation where the respondents "offered no evidence" that detention would "prevent flight or protect against danger to the community"). To the contrary, on the record before the Court, there is no evidence of Pineda-Berrios being arrested for, or committing, any crime during the 17 months that he remained in society and no indication that he missed any required appointments with immigration officials or violated any of the conditions of his parole.

To the extent the federal respondents claim that Pineda-Berrios's November 13, 2025 arrest revoked his parole, that argument fails because there is no evidence in the record before

12

the Court to suggest that any DHS officer has conducted an individualized determination of Pineda-Berrios's circumstances before he was arrested. On this record, it is easy to see how any additional procedure would be valuable where, as here, "the only procedure required for the deprivation of [petitioner's] liberty appears to be an unreviewable decision by an agency official subject to no formal procedures or review." L.M., 2026 WL 103231, at *13.

Third, the federal respondents' interest in detaining Pineda-Berrios without a hearing is nonexistent. Of course, they have "no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by . . . alternative conditions." Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017); see Pinchi, 792 F. Supp. 3d at 1036 ("Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest.").

Nor can the government suggest that providing a pre-detention hearing would be fiscally or administratively onerous. As to the financial burden of providing a pre-detention hearing, "in immigration court, custody hearings are routine and impose a minimal cost." Singh v. Andrews, 803 F. Supp. 3d 1035, 1047–48 (E.D. Cal. 2025) (cleaned up). Moreover, "it is likely that the cost to the government of detaining [Pineda-Berrios] pending any bond hearing would significantly exceed the cost of providing [him] with a pre-detention hearing." Pinchi, 792 F. Supp. 3d at 1036; see also Hernandez, 872 F.3d at 996 (noting that in 2017, "the costs to the public of immigration are 'staggering': $158 each day per detainee" whereas "[s]upervised release programs cost . . . between 17 cents and 17 dollars each day per person"). As to the administrative burden of providing a pre-detention hearing, the federal immigration code is rife with references to individualized determinations before neutral decisionmakers, and there is absolutely no reason why the federal respondents could not provide Pineda-Berrios with a

13

hearing that mirrors a § 1226(a) bond hearing to determine whether the revocation of his parole is justified.

Finally, although the federal respondents have a "weighty" "interest in efficient administration of the immigration laws," Landon v. Plasencia, 459 U.S. 21, 34 (1982), they "remain subject to an obligation to 'effectuate [Pineda-Berrios's] detention in a manner that comports with due process,'" Abadin v. Noem, 2026 WL 217148, at *4 (W.D. Wash. Jan. 28, 2026) (citation omitted). Nothing in this record explains why the federal respondents are "unable to efficiently enforce the immigration laws . . . while also affording individuals with their 'core' due process right: 'notice and an opportunity to be heard.'" Make the Rd. N.Y. v. Noem, 2025 WL 2494908, at *19 (D.D.C. Aug. 29, 2025) (quoting LaChance v. Erickson, 522 U.S. 262, 266 (1998)). In sum, the federal respondents have provided Pineda-Berrios "with no process at all, much less prior notice, no showing of changed circumstances, or an opportunity to respond." Valdez v. Joyce, 2025 WL 1707737, at *4 (S.D.N.Y. June 18, 2025). Although the federal respondents have discretion to release a noncitizen on parole, that does not mean they can revoke that parole on a mere whim, which is what has happened in this case. Accordingly, Pineda-Berrios's continued detention violates the Due Process Clause, and he must be released from custody immediately.[6]

IV.

For the reasons stated above, Pineda-Berrios's Petition, [Dkt. No. 1], will be granted as to Count III by an Order to be issued with this Memorandum Opinion, which will require the

---

[6] Although Pineda-Berrios has not raised an Administrative Procedure Act claim, many courts have found decisions by DHS to revoke a noncitizen's parole without an individualized hearing to be arbitrary and capricious. See Perez, 2025 WL 3171742, at *6–7; Orellana, 2025 WL 2402780, at *4–7; Abadin, 2026 WL 217148, at *3; Y-Z-L-H, 792 F. Supp. 3d at 1144–47.

14

federal respondents to immediately release Pineda-Berrios from custody under the conditions of his preexisting parole, except for the automatic one-year limitation.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

Entered this 11th day of February, 2026.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge